612 F.2d 411
 Arnulfo M. DIAZ and Socorro Diaz, as parents and next
friends of Fernando Diaz, Miguel A. Diaz and Juan F. Diaz,
Jose Vasquez, as the parent and next friend of David
Vasquez, Individually and on behalf of all other persons
similarly situated, Plaintiffs-Appellants,
v.
SAN JOSE UNIFIED SCHOOL DISTRICT, Charles Knight,
Individually and as DistrictSuperintendent of the San Jose
Unified School District, Neil H. Geier, Jr.,Elizabeth J.
Allen, Edwin P. Jones, Jr., Mary E. McCreath and Donald
L.Raimondi,Individually and as members of the Board of
Education of the San Jose UnifiedSchool District,
Defendants-Appellees.
 No. 76-2148.
 United States Court of Appeals,
Ninth Circuit.
 Nov. 5, 1979.
Rehearing Denied Feb. 15, 1980.
 
 Stephen M. Kociol, Comm. Legal Service, San Jose, Cal., for plaintiffs-appellants.
 Michael di Leonardo, Sunnyvale, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before HUFSTEDLER and TANG, Circuit Judges, and SMITH,* District Judge.
 HUFSTEDLER, Circuit Judge:
 
 
 1
 Appellants, parents of Spanish-surnamed children attending public school in the San Jose Unified School District, brought this class action on behalf of themselves and all other parents of children similarly situated seeking desegregation of the school district. They charge that the San Jose Unified School District ("district"), its superintendent, and the members of its Board of Education ("school board") maintained racially imbalanced schools in violation of the Fourteenth Amendment. After a hearing on the merits, the district court found that the school district was racially imbalanced and that the appellees created or maintained the ethnic imbalance, but that in so doing the appellees did not act with "segregative intent," as that term has been construed by the United States Supreme Court and this court. The issue on appeal is whether the district court applied the correct criteria in deciding the segregative intent issue. We vacate and remand the case to the district court for reconsideration in the light of Columbus Board of Education v. Penick (1979) ---U.S. ----, 99 S.Ct. 2941, 61 L.Ed.2d 666; Dayton Board of Education v. Brinkman (1979) ---U.S. ----, 99 S.Ct. 2971, 61 L.Ed.2d 720; and the views herein expressed.
 
 
 2
 The district court's opinion sets forth the factual background of the controversy. (Diaz v. San Jose Unified School District (N.D.Cal.1976) 412 F.Supp. 310.) We briefly summarize the pertinent facts.
 
 
 3
 The challenged school district runs from north to south through central San Jose, California. The district is 16 miles long and from one and one-half to four miles wide. The Spanish-surnamed population is concentrated in the downtown area in the northern part of the district. The Anglo residents are primarily in the southern part of the district, a suburban area. The Spanish-surnamed students make up 24.6 percent of the total student population of the district. In the northern area, the student population is 60.5 percent Spanish-surnamed, representing 78.8 percent of the Spanish-surnamed school children in the district. The student population of the southern-suburban schools is .07 percent Spanish-surnamed. No statutorily mandated "dual system" of segregated schools has ever existed in the district.
 
 
 4
 For many years, the district adhered to a "neighborhood policy," under which students are required to attend schools within designated "attendance areas" in which they reside. Although the goal of the policy is to allow students to attend schools within walking distance of their homes, extensive transportation of the students in the district is used, but transportation is only within attendance areas.
 
 
 5
 Appellees knew, at least as early as 1962, that the district was racially imbalanced. At that time, the school board passed a resolution acknowledging that segregation was inherently harmful. Following state requirements, the school board conducted annual ethnic surveys beginning in 1966 which disclosed a continuing pattern of racial imbalance. The school board reaffirmed its commitment to racial integration in a policy statement issued in 1970.
 
 
 6
 Since 1965, appellees have undertaken a whole series of actions that maintained the racial imbalance of the district. It also omitted courses of action, readily available to it, that would have ameliorated racial imbalance. Since 1965, the school district has built nine new schools on newly-selected sites. All nine opened as racially imbalanced schools. The district followed state guidelines regarding racial balance in selecting sites in the northern downtown area, but it did not consider the guidelines in choosing sites in the suburban area.
 
 
 7
 Pursuant to state legislation setting minimum safety standards for schools, the district regularly conducted inspections of all schools. In 1967, the inspections revealed that numerous school buildings in the district failed to meet state safety requirements. After the Los Angeles earthquake in February, 1971, the school board voted to close all unsafe schools at the end of the 1971 school year. Pending reconstruction of the buildings, classes were held in portable classrooms. The school board decided to rebuild most of the unsafe downtown schools on their original sites; no attendance boundaries were changed. Ten of the rebuilt schools were racially imbalanced in 1971, and that condition remained unchanged after reconstruction. Only two schools were balanced in 1971; they remained balanced thereafter. Only two schools were rebuilt on different sites; both of those schools were imbalanced both before and after reconstruction. The school board did not consider the impact of reconstruction on existing ethnic imbalance, and it rejected suggestions for rebuilding that would have improved ethnic balance.
 
 
 8
 Seven of the schools which were closed for failure to meet safety standards were not rebuilt. In reassigning students from the closed schools, ethnic balance was improved from the point of view of the reassigned students, although the ethnic balance at receiving schools was sometimes worsened. Reassignments were made solely to contiguous attendance areas.
 
 
 9
 The school district owns over 400 portable classrooms, which are distributed to schools on the basis of the individual needs of those schools. The district created seven downtown schools entirely from portables. The school board did not consider using those portable classrooms in a manner to improve ethnic balance. Rather, in response to overcrowding in southern schools, the school board put those schools on double sessions pending construction of new schools. Although the school board recognized that double sessions are educationally undesirable, it did not transport students from the overcrowded southern schools to the underused northern schools. Although some students were transferred to other schools within the southern area, none were transported to non-adjacent schools. The board was fully aware that any improvement in racial imbalance could not be achieved without district-wide bussing. The board nevertheless repeatedly declared itself opposed to bussing for the purpose of integration. In 1963, the board passed a resolution assuring the community of its opposition to bussing for integration, and it has never deviated from this position.
 
 
 10
 As all parties recognize, when no statutory dual system has ever existed, appellants "must prove not only that segregated schooling exists but also that it was brought about or maintained by intentional state action." (Keyes v. School District No. 1 (1973), 413 U.S. 189, 198, 93 S.Ct. 2686, 2692, 37 L.Ed.2d 548; Columbus Board of Education v. Penick, supra, ---U.S. at ----, 99 S.Ct. 2941.) The district court succinctly summarized the appellants' contention: "To prove that defendants have operated a segregated school system in violation of the Fourteenth Amendment, plaintiffs first established that the board was fully aware of the existing racial imbalance in the district, and then attempted to demonstrate that ethnic imbalance resulted from defendants' intentional conduct. To prove segregative intent, plaintiffs introduced evidence of the district's educational policies on (1) site selection and school construction; (2) adoption of a neighborhood school policy with board-designated attendance areas; (3) reconstruction of Field Act schools; (4) school closures and student reassignments; (5) location of portable classrooms and maintenance of double sessions; (6) student transportation; (7) presentation of materials supporting bond elections; (8) response to integration proposals by a citizens' committee; (9) faculty and staff assignments and (10) failure to integrate despite a state statutory duty and a publicly-issued board policy to relieve ethnic imbalance." (Diaz v. San Jose Unified School District, supra, 412 F.Supp. at 315.)
 
 
 11
 The impact of these acts and policies of the appellees exacerbated the racial imbalance in a number of schools within the district and improved racial balance in none of them. "Adherence to a particular policy or practice, 'with full knowledge of the predictable effects of such adherence upon racial imbalance in a school system is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn.' " (Columbus Board of Education v. Penick, supra, ---U.S. at ----, 99 S.Ct. at 2950.)
 
 
 12
 To contradict the adverse inferences arising from the appellants' proof, appellees relied solely on their consistent adherence to a neighborhood school policy, which was racially neutral. The district court concluded that consistent adherence to a neighborhood school policy was enough, standing alone, to dispel inferences of segregative intent that arose from the combination of actions and inactions of the appellees resulting in the racial imbalance of which appellants complained.
 
 
 13
 The district court explained: "The critical issue in this litigation is thus whether a school board may apply a neighborhood school policy." (Diaz v. San Jose Unified School District, supra, 412 F.Supp. at 334.) "The evidence shows that defendant School District has adhered to a 'neighborhood school policy,' with the result that ethnic composition of the schools merely reflects residential patterns." (Id. at 312.) "If, however, neutral adherence to a neighborhood school policy is constitutional, this court has no authority to intervene and order integration." (Id. at 334.) Thus, as we read the district court's opinion, the district court concluded that the existence of consistently followed neighborhood school policy constituted either a complete defense to a charge of segregative intent, or, completely dispelled the inferences of segregative intent that flowed from the appellants' proof.
 
 
 14
 We disagree with the district court's characterization of the issue, and, in the light of Columbus Board of Education v. Penick, supra, we do not believe that a neighborhood school policy, no matter how consistently followed, can be a determinative fact in proving the ultimate fact of forbidden purpose.[1] As usual in a case in which subjective intent is an essential element, existence of that intent can ordinarily be established only by circumstantial evidence. An inference of segregative intent arose from the appellants' proof. Appellees' proof that they consistently followed a long-established policy of neighborhood schools is merely relevant evidence to be taken into account in deciding whether the forbidden intent did or did not exist. Moreover, proof of such a policy, under all of the facts and circumstances of a case, may be of slight relevancy or none at all.
 
 
 15
 A neighborhood school policy is not constitutionally suspect. Such a policy does not have constitutional implications one way or the other without a penetrating examination of the complete context in which the neighborhood policy was initially applied and subsequently enforced. Thus, for example, a decision to build a new school in a neighborhood that is entirely white, or entirely Hispanic, is not simply an enforcement of a neighborhood school policy. Location of the school, itself, affects the neighborhood. As the Supreme Court observed in Keyes v. School District No. 1, supra, 413 U.S. at 201-02, 93 S.Ct. at 2694: "(T)he practice of building a school . . . to a certain size and in a certain location, 'with conscious knowledge that it would be a segregated school,' . . . has a substantial reciprocal effect on the racial composition of other nearby schools. So also, the use of mobile classrooms, the drafting of student transfer policies, the transportation of students, and the assignment of faculty and staff, on racially identifiable bases, have the clear effect of earmarking schools according to their racial composition, and this, in turn, together with the elements of student assignment and school construction, may have a profound reciprocal effect on the racial composition of residential neighborhoods within a metropolitan area, thereby causing further racial concentration within the schools."
 
 
 16
 In short, discriminatory intent may motivate the building of a school in a particular location, and that intent is not dispelled by proof that all students in a district were required to attend neighborhood schools.
 
 
 17
 School closures may be fully justified by many factors which are untainted by forbidden motivations. But school closures cannot be justified by neighborhood school policies. The obvious effect of a closure is to remove a neighborhood school. Similarly, the building of a new school may be undertaken for many reasons that have no racial overtones, but new school construction is not a function of a neighborhood school policy, although it obviously affects attendance patterns in the neighborhood in which the school is located and it may also have a reciprocal effect upon attendance patterns in other schools within the district. As the Supreme Court observed in Swann v. Charlotte-Mecklenburg Board of Education (1971) 402 U.S. 1, 20-21, 91 S.Ct. 1267, 1278, 1279, 28 L.Ed.2d 554:
 
 
 18
 "The construction of new schools and the closing of old ones are two of the most important functions of local school authorities and also two of the most complex. They must decide questions of location and capacity in light of population growth, finances, land values, site availability, through an almost endless list of factors to be considered. The result of this will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system. Over the long run, the consequences of the choices will be far reaching. People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods.
 
 
 19
 "In the past, choices in this respect have been used as a potent weapon for creating or maintaining a state-segregated school system. In addition to the classic pattern of building schools specifically intended for Negro or white students, school authorities have sometimes, since Brown, closed schools which appeared likely to become racially mixed through changes in neighborhood residential patterns. This was sometimes accompanied by building new schools in the areas of white suburban expansion farthest from Negro population centers in order to maintain the separation of the races with a minimum departure from the formal principles of 'neighborhood zoning.' . . .
 
 
 20
 "In ascertaining the existence of legally imposed school segregation, the existence of a pattern of school construction and abandonment is thus a factor of great weight."
 
 
 21
 Strict adherence to a neighborhood policy is no more than circumstantial evidence that bears upon the existence or non-existence of segregative intent. The existence of such a policy is not enough to prove the absence of segregative intent. We remand the case to the district court for reconsideration in the light of Columbus Board of Education v. Penick, supra, Dayton Board of Education v. Brinkman, supra, and the views herein expressed.[2]
 
 
 22
 The judgment is vacated and the cause is remanded to the district court for further proceedings consistent with the views herein expressed.
 
 RUSSELL E. SMITH, District Judge (dissenting):
 
 23
 I respectfully dissent.
 
 
 24
 In a painstaking opinion (Diaz v. San Jose Unified School District, 412 F.Supp. 310 (N.D.Cal.1976)) the district judge discussed, under subheads A-J inclusive, all of the facts on which appellant relied to establish an intent to segregate. The district judge then made two express findings: first, "The court finds that the district has consistently adhered to a neighborhood school policy"; and second, "The board has applied this policy neutrally." 412 F.Supp. at 334. The district judge then made the ultimate finding of fact: "The court finds that defendants, who consistently adhered to a neighborhood school policy, have never acted with segregative intent." 412 F.Supp. at 335. I do not think that the judge did find, or that he could have found, that the Board applied the policy neutrally without considering all of the evidence so carefully detailed by him. In short, I think the district court did what the remand tells him to do.
 
 
 25
 I would affirm.
 
 
 
 *
 Honorable Russell E. Smith, United States District Judge, District of Montana, sitting by designation
 
 
 [1]
 Because both sides presented evidence directed to the segregative intent issue, the district court was not faced with the question whether appellants' evidence made out a prima facie case of segregative intent. Contrast Keyes v. School District No. 1, supra, 413 U.S. at 209, 93 S.Ct. 2686; Soria v. Oxnard School District Board of Trustees (9th Cir. 1973) 488 F.2d 579. For the same reason, we have no occasion to reach the question whether appellants' evidence placed upon the appellees the burden of justifying their conduct and whether failure to do so would require judgment in the appellants' favor. See, e. g., Dayton Board of Education v. Brinkman, supra, ---U.S. at ----, 99 S.Ct. 2971; Columbus Board of Education v. Penick, supra, ---U.S. at ----, 99 S.Ct. 2941; Keyes v. School District No. 1, supra, 413 U.S. at 209, 93 S.Ct. 2686
 
 
 [2]
 We do not wish to be understood as indicating any opinion on the relative weight of any or all of the evidence that has been submitted; rather, our decision is confined to the determination of law that conclusive or dispositive effect cannot be given to a consistently followed, facially neutral, neighborhood school policy