SEYMOUR, Circuit Judge.
More than three years ago, we reversed the district court’s decision in this land *588 mark school desegregation case. Brown v. Board of Educ., 892 F.2d 851 (10th Cir. 1989). The Supreme Court recently vacated our lengthy opinion, Board of Educ. v. Brown, — U.S. —, 112 S.Ct. 1657, 118 L.Ed.2d 381 (1992), remanding for further consideration in light of Board of Educ. v. Dowell, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), and Freeman v. Pitts, — U.S. —, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). After oral argument and due consideration of Dowell and Freeman, we reinstate our prior opinion in full, with the additions set out below.[1]
I.
On remand we are required to determine whether recent Supreme Court authority has altered the landscape of desegregation law so as to change our prior opinion. We reversed the district court in part because it “erred in placing the burden on plaintiffs to prove intentional discriminatory conduct rather than according plaintiffs the presumption that current disparities are causally related to past intentional conduct.”[2] Brown, 892 F.2d at 854. In its opinion, the district court wrote that, “after 30 years, one cannot assume that the racial imbalance which remains is a vestige of the de jure system or other illegal segregation.” Brown v. Board of Educ., 671 F.Supp. 1290, 1297 (D.Kan. 1987). In Freeman, the Supreme Court said simply: “The school district bears the burden of showing that any current [racial] imbalance is not traceable, in a proximate way, to the prior violation.” — U.S. at —, 112 S.Ct. at 1447 (emphasis added). See also Lee v. Etowah County Bd. of Educ., 963 F.2d 1416, 1425 (11th Cir.1992). Freeman thus explicitly reaffirms one of the principles that required our reversal of the district court. The Court further held that a court may relinquish supervisory control over a former de jure school system in an incremental manner, Freeman, — U.S. at —, 112 S.Ct. at 1445.
Dowell underscored the equitable nature of the desegregation decree, and indicated that the term “unitary” has no magical import. 498 U.S. at —-—, 111 S.Ct. at 635-36. Our prior opinion does not treat unitariness as a rigid concept; it instead insists that a school district seeking freedom from continued judicial oversight must prove that any' current racial imbalance is not connected to the prior de jure system. Dowell does not mark a retreat from the principle that “[t]he measure of any desegregation plan is its effectiveness.” Davis v. School Comm’rs, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971); see also Freeman, — U.S. at —, 112 S.Ct. at 1446. We previously applied this test in assessing the district court’s unitariness [3] finding under the clearly erroneous standard. Brown, 892 F.2d at 868.
The Supreme Court’s cases charge school boards that once operated school systems segregated by law “with the affirmative duty to take whatéver steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.” Green v. County School Bd., 391 U.S. 430, 437-38, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). After an initial finding of liability, the district court may enforce this duty “without any new proof of a constitutional violation.” Freeman, — U.S. at —, 112 S.Ct. at 1456 (Blackmun, J. concurring). Here, the question is not whether plaintiffs successfully established in the 1986 trial that the school system operated in a manner inconsistent with the constitutional guarantee of equal protection; that question was answered in 1955. Instead, as we *589 made clear in our initial opinion, the question is whether Topeka has successfully discharged the duty imposed by the Constitution to eliminate the vestiges of de jure segregation.
Both Dowell and Freeman address the means by which a school system may be discharged from the active supervision of the courts. In Dowell, the Court required the district court to consider “whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable.”[4] Dowell, 498 U.S. at —, 111 S.Ct. at 638; Freeman, — U.S. at —-—, 112 S.Ct. at 1449-50. Dowell reaffirmed Green’s requirement that a court considering whether the vestiges of past segregation have been eliminated must look to “every facet of school operations.” 498 U.S. at —, 111 S.Ct. at 638 (quoting Green, 391 U.S. at 435, 88 S.Ct. at 1692).
Freeman expanded on this requirement by explicitly stating that “[a] federal court in a school desegregation case has the discretion to order an incremental or partial withdrawal of its supervision and control,” — U.S. at —-—, 112 S.Ct. at 1444-45, thereby allowing a school system to achieve compliance in one facet of its operations before it has fulfilled the whole of its affirmative duty. Neither Do-well nor Freeman suggests that the plaintiffs in the remedial phase of school desegregation litigation must make a new showing of discriminatory intent in order to obtain relief from a current condition of segregation. The district court here wrongly required the plaintiffs to make such a showing. See Brown, 671 F.Supp. at 1295 (“Plaintiffs have the burden of proving that illegal segregation exists in U.S.D. # 501.”).
“Proper resolution of any desegregation case turns on a careful assessment of its facts.” Freeman, — U.S. at —, 112 S.Ct. at 1437. The facts underlying this case are far different than those before the Supreme Court in either Dowell or Freeman. In Oklahoma City, the school board adopted a comprehensive plan to desegregate the school system in 1972 and operated under that plan for many years. See Dowell v. Board of Educ., 890 F.2d 1483, 1486-87 (10th Cir.1989), rev’d, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). In DeKalb County, the district court had approved a plan to achieve maximum practicable desegregation. Freeman, — U.S. at —, 112 S.Ct. at 1447. Subsequent to the implementation of the plan, demographic changes resulted in largely segregated residential neighborhoods. At the same time, the population of DeKalb County increased dramatically. See id. — U.S. at —, 112 S.Ct. at 1438-40. In the face of these changes, the school system aggressively employed a Minority-to-Majority transfer program and several magnet school programs in an effort to maintain some level of racial balance in student assignment. Id. — U.S. at —, 112 S.Ct. at 1440. In Topeka, in contrast, the school board did very little to desegregate its student assignment practices.[5] See Brown, 892 F.2d at 874. Fortunately, increasing residential integration actually helped to *590 decrease racial segregation in some of the city’s neighborhood schools. Unlike De-Kalb County, the best that can be said of Topeka’s efforts is this: “The district has not bucked the demographic forces that have improved the racial balance of schools.” Brown, 671 F.Supp. at 1309 (emphasis added).[6]
“Our post-Green cases provide' that, once state-enforced school segregation is shown to have existed in a jurisdiction in 1954, there arises a presumption, ... that any current racial imbalance is the product of that violation.” Freeman, — U.S. —, 112 S.Ct. at 1453 (Scalia, J. concurring); see United States v. Fordice, — U.S. —, —, 112 S.Ct. 2727, 2735, 120 L.Ed.2d 575 (1992). This is the presumption that the district court failed to accord plaintiffs in this case. See Brown, 892 F.2d at 867-68. At the time of trial, the Topeka school system operated a number of racially identifiable schools. See id. at 870. In the continuing remedial phase of this litigation, then, the district court must impose upon defendants the substantial burden of demonstrating the absence of a causal connection between any current condition of segregation and the prior de jure system. Until the school district meets this burden, the district court must retain some measure of supervision over the school system.[7]
In this case, the district court disregarded Topeka’s history of inaction, observing: “At any time, more could have been done to achieve racial balance in the schools. But, it begs the issue of this case to argue that racial balancing must be done today because it was not done yesterday.” Brown, 671 F.Supp. at 1309. To expect the lingering effects of legally mandated separation to magically dissolve with as little effort as the Topeka school district exerted, see Brown 892 F.2d at 874, is to expect too much. ■ “[Sjtubborn facts of history linger and persist,” Freeman, — U.S. at —, 112 S.Ct. at 1448, and, if left unattended, they fester. The Constitution does not permit the courts to ignore today’s reality because it is temporally distant from the initial finding that the school system was operated in violation of the constitutional rights of its students. Temporal distance matters only to the extent that changes across that time period, unconnected to the de jure system’s lingering effects, are responsible for what is observable today. See Freeman, — U.S. at —, 112 S.Ct. at 1448 (“fundamental changes ... not attributable to the former de jure regime” responsible for currently segregated schools).
The district court’s conclusion that the Topeka system had achieved unitary status depended on its belief that the “district’s conduct over thirty years [did not] *591 indicate[] a desire to perpetuate segregation.” 671 F.Supp. at 1309; see id. at 1311 (“The racially imbalanced schools are not the product of overt or covert intentional segregative conduct.”). This belief does not adequately support the court’s decision. The absence of affirmatively discriminatory action or intent across time is insufficient, without more, to demonstrate the lack of a causal connection between the prior de jure system and the present system. It is far easier to demonstrate an absence of segregative intent than it is to rebut the presumed causal connection between current conditions and legally mandated segregation.[8] See Freeman, — U.S. at —, 112 S.Ct. at 1453 (Scalia, J. concurring) (presumed connection is powerful).
The lesson of Freeman is not that demographic changes in a district absolve a school board of its affirmative duty to desegregate. Instead, the case teaches that demographic change may produce racially identifiable schools in a district that has fulfilled its affirmative duty. What matters is whether current racial identifiability is a vestige of a school system’s de jure past, or only a product of demographic changes outside the school district's control. If the current condition is a vestige then the school system has not fulfilled its affirmative duty. “If the State has not discharged this duty, it remains in violation of the Fourteenth Amendment.” Fordice, — U.S. at —, 112 S.Ct. at 2735.
We have little reason to doubt defendant’s repeated insistence that its various decisions were not motivated by racial animus. Indeed, the innovative character of the school system by the time of trial suggests a genuine commitment to providing quality education to all its students. See Brown, 892 F.2d at 889. The district court thought such a showing sufficient. As a matter of law, it was not. See Dayton Board of Educ. v. Brinkman, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) (“As was clearly established in [prior cases], the Board had to do more than abandon its prior discriminatory purpose."); Harris v. Crenshaw County Bd. of Educ., 968 F.2d 1090, 1095 (11th Cir., 1992) (“[S]chool officials are obligated not only to avoid any official action that has the effect of perpetuating or reestablishing a dual school system, but also to render decisions that further desegregation and help to eliminate the effects of the previous dual school system.”). The school system failed to demonstrate that the current racial identifiability of its schools is not connected to its prior practice of segregation. See Brown, 892 F.2d at 877. Nothing in Freeman or Dowell compels us to alter that conclusion.
II.
In shaping a remedy on remand the district court should, in accordance with Freeman’s incremental approach,.consider whether it would be appropriate to relinquish supervision of those areas of the school system plaintiffs conceded were unitary. See Brown, 892 F.2d at 869 n. 53 (“Topeka school system is unitary with respect to facilities, extracurricular activities, curriculum, transportation, and equality of education.”). In so doing, the district court must assess
whether retention of judicial control is necessary or practicable.to achieve compliance with the decree in other facets of the school system; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good faith commitment to the whole of the court’s decree and' to those provisions of the law and the constitution that were the predicate for judicial intervention in the first instance.
Freeman, — U.S. —, 112 S.Ct. at 1446 (emphasis added). Freeman thus requires the district court to make two findings before withdrawing its supervision incrementally. First, the court must find that the relinquishment of control over the facet *592 at issue would not make it impossible to craft a remedy that will achieve compliance in the system’s other facets. Next, the court must find that the school system has demonstrated good faith. This second inquiry is not limited to an individual facet. Instead, the court must consider the system’s efforts to desegregate, as a whole, across time. Id.
In its initial opinion, the district court did not evaluate the school system’s good faith. On remand, it must make such a finding and its evaluation must be based on objective criteria. See id. Mere protestations of an intention to comply with the Constitution in the future will not suffice. Instead, specific policies, decisions, and courses of action that extend into the future must be examined to assess the school system’s good faith. Id.
In its brief, after the Supreme Court remanded this case to us, the school district argued that:
If Plaintiffs prevail in this case and a court-ordered remedy is implemented, the danger is that in Topeka, as in Oklahoma City and DeKalb County, the remedy will not have more than a temporary effect upon student attendance figures. Depending upon the nature of the remedy, white flight from the racially balanced schools may occur, as well as community resentment over court interference and the expenditure of resources for noncurricular purposes. Under the teaching of Dowell, after the Topeka school district would have complied with such a plan in good faith for a number of years, court jurisdiction could then be withdrawn. It is highly probable that the neighborhood schools at the time of withdrawal would be more imbalanced than they are today. Why should Topeka schools be burdened for no long-term benefit?
Brief of Appellee at 36 (citation omitted) (emphasis added). It is difficult to understand how the district can contend that compliance with the Constitution does not confer a long-term benefit upon the students in Topeka. At the same time, the district’s argument highlights a potential problem with Dowell. Depending on the definition of “good faith,” the possibility of immediate resegregation following a declaration of unitariness seems all too real. For this reason, we are convinced that evaluation of the “good faith” prong of the Dowell test must include consideration of a school system’s continued commitment to integration. A school system that views compliance with a school desegregation plan as a means by which to return to student assignment practices that produce numerous racially identifiable schools cannot be said to be acting in “good faith.” See Dowell, 498 U.S. —, 111 S.Ct. at 637 (prior to discharge, district court must find “that it was unlikely that the school board would return to its former ways.”).
In order to show good faith, for purposes of either incremental or final discharge from ongoing court supervision, Topeka must demonstrate that “its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations.” Freeman, — U.S. at —, 112 S.Ct. at 1446. The inquiry into Topeka’s good faith, like the inquiry into whether further remedial efforts are necessary, must consider whether Topeka has taken such affirmative steps in the direction of desegrega-, tion so as to establish a “consistent pattern of lawful conduct.” A comprehensive plan, adopted and followed by the school board, aimed at eliminating the vestiges of segregation to the system would be evidence of good faith; so might a school board resolution declaring the school board’s intention to comply with the Constitution in the future, see Lee v. Talladega County Bd. of Educ., 963 F.2d 1426, 1428 (11th Cir.1992), but only if coupled with affirmative efforts across time. As we have observed above, inaction in the face of the affirmative duty to desegregate is not lawful conduct. A school system that does not take the required steps cannot be found in good faith and may not be discharged from continued supervision with respect to any facet of its operations.
The decision of a court to relinquish supervisory control over one or more facets of the school system is not tantamount to *593 an abandonment of jurisdiction. Therefore, if it were later to appear that a vestige of segregation in a facet still under the court’s control has led to a reemergence of segregation in a facet over which the court had relinquished control, the court would not be powerless to react. “[Bjecause the court retains jurisdiction over the case, it should of course reassert control over [the relinquished area] if it finds that this does happen.” Freeman, — U.S. at —, 112 S.Ct. at 1455 (Souter, J. concurring). In such an event, because the reemergence would be linked to a vestige of the past system, it would itself be a vestige. Consequently, no showing of discriminatory intent would be needed to enable the court to address the problem.
With respect to the areas of student assignment and faculty/staff assignment, which were not unitary when the trial was held in this case, the district court must consider the current situation in Topeka schools in order to fashion an appropriate remedy. Six years have passed since the trial, and it is likely that many changes have occurred in the school system. The district court should inquire into the recent history of Topeka’s efforts to fulfill its affirmative duty, and should assess the effects of those efforts on student and faculty staff assignments. It must shape a remedy that addresses the remaining vestiges of segregation in the Topeka school system, and that promises to eliminate them to the extent practicable. See Dowell, 498 U.S. —, 111 S.Ct. at 638.
III.
We are mindful of the limited authority and ability of the courts to reshape society, but we possess an abiding respect for the constitutional guarantee of equal protection and the responsibility of the courts to insure that government fulfills its promise to all its citizens. The law that required reversal of this case in 1989 has not been changed by Freeman or Dowell. The opinion we reinstate today is consistent with these most recent Supreme Court pronouncements in the area of school desegregation. We say simply that because Topeka has not fulfilled its affirmative duty in the areas of student and faculty/staff assignments, the district court erred in concluding that the system as a whole had achieved unitary status. The district court must instead formulate an appropriate remedy.
Accordingly, we again REVERSE the decision of the district court, and we REINSTATE our prior opinion.

. We do not address the district court’s Title VI holding, its dismissal of the Governor of the State of Kansas, or its ruling that the State Board of Education bears no liability for segregation in Topeka's schools. Each of these issues is resolved by our prior opinion.

. After a review of the record, we also held clearly erroneous the district court’s findings that the school system had reached unitary status in student assignment and faculty and staff assignment practices.

. The term "unitary" describes a school system or a facet of a school system that has been brought into compliance with the constitution. See Board of Educ. v. Dowell, 498 U.S. 237, —, 111 S.Ct. 630, 636, 112 L.Ed.2d 715 (1991).

. Any tension perceived by the school board between this standard and our requirement that the school system must "eliminate[ ] all traces of past intentional segregation to the maximum feasible extent,” Brown v. Board of Educ., 892 F.2d 851, 859 (10th Cir.1989), is more imagined than real. Indeed, a leading dictionary defines "practicable” as “feasible.” See Webster's Third New International Dictionary at 1780 (1981). The same dictionary defines “vestige" as "a remaining bit that constitutes a memorial or trace.” Id. at 2547.

. The same is true with regard to faculty/staff assignment practices. "In Topeka, ... there is a clear pattern of assigning minority faculty/staff in a manner that reflects minority student assignment.” Brown, 892 F.2d at 872. This pattern may itself reinforce racial identifiability, and if left unattended "will act as an incubator for resegregation in other[ ]” facets of the school system. Freeman v. Pitts, — U.S. —, —, 112 S.Ct. 1430, 1455, 118 L.Ed.2d 108 (1992) (Souter, J. concurring). Nothing in the recent Supreme Court cases alters our holding with regard to faculty/staff assignments. We reiterate that a failure to achieve compliance with regard to faculty/staff assignment is particularly disturbing because it is the one facet within the exclusive control of the local school authorities.

. The district court’s decision in Freeman rested in part on its holding that the DeKalb County schools were successfully desegregated in student assignment in 1969. Freeman, — U.S. at —, 112 S.Ct. at 1439. Subsequent resegregation, the district court held, was caused by demographic changes unconnected to the prior de jure system. Id, — U.S. at —, 112 S.Ct. at 1438-40. In the present case, the district court did state: "Demographic forces, uncontrolled by defendants, form the racial composition of the schools.” Brown v. Board of Educ., 671 F.Supp. 1290, 1310 (D.Kan.1987). This comment, however, is in considerable tension with the district court’s observations that demographics have had a desegregative influence on student assignment in Topeka’s schools. See Brown, 892 F.2d at 874. Moreover, in light of the school district’s failure to ever operate without racially identifiable schools, and the district court’s failure to apply the appropriate legal standard, the court's conclusion that demographics caused segregation simply does not amount to a supportable holding that the current condition of segregation in Topeka is wholly unconnected to the prior de jure school system. The absence of a moment at which Topeka achieved compliance with the Constitution is vital because it is only "fojnce the racial imbalance due to the de jure violation has been remedied [that] the school district is under no duty to remedy imbalance that is caused by demographic factors." Freeman, — U.S. at —, 112 S.Ct. at 1447 (emphasis added).

. This supervision does not amount to the imposition of federal jurisdiction in perpetuity. "[Fjederal supervision of local school systems was intended as a temporary measure to remedy past discrimination." Dowell, 498 U.S. at —, 111 S.Ct. at 637. We simply insist that the school board accomplish the required “transition to a system of public education freed of racial discrimination," id. (quoting Brown v. Board of Educ., 349 U.S. 294, 299-301, 75 S.Ct. 753, 755-57, 99 L.Ed. 1083 (1955)), prior to the relinquishment of federal court jurisdiction.

. Indeed, several of the school district’s actions across time had directly segregative effects. See Brown, 892 F.2d at 874-77.