Stuart MARSH, Plaintiff,

v.

FLINT BOARD OF EDUCATION, et al., Defendants.

Civ. A. No. 80–CV–40349–FL.

United States District Court,
E.D. Michigan, S.D.

Feb. 16, 1989.

C. Rees Dean, Flint, Mich., for Board of Educ. of City of Flint and Leo Macksood.

Thomas A. Baird, Foster, Swift, Collins & Coey, Lansing, Mich., for United Teachers of Flint, Inc., Harold Keim and Lane Hotchkiss.

Richard J. Drew, Flint, Mich., Constance E. Brooks, Mountain States Legal Foundation, Denver, Colo., for Stuart Marsh.

## PROLOGUE

NEWBLATT, District Judge.

Occasionally a judge has the opportunity to deal twice with exactly the same question. The first time the Court was bound to interpret and follow specific precedent of the Court of Appeals for the Sixth Circuit as there was no contrary Supreme Court precedent. Feeling bound, the first Opinion expressed the Court's misgivings concerning the outcome compelled by following that precedent. The views expressed therein reflected the strongly-felt beliefs of many people of racial goodwill on both sides of the affirmative action fence—those who think that any and all affirmative action programs are necessary and justified in order to remedy the effects of undoubted past racial discrimination, and those who think that all such programs will further polarize races and ultimately create more racial strife. Excluded from consideration, of course, are those narrow and bigoted views that fail to recognize the racial discrimination that continues to exist and has existed in this country for years. Progress has indeed been made because almost all of us recognize that racial discrimination is wrong and illegal. But that simple precept does not tell us what can and should be done to eliminate current discrimination and the effects of past discrimination without consequences as pernicious as those which created the need for a solution.

My first Opinion which upheld the affirmative action plan involved in this case, raised sincere questions about the ultimate effect of such a plan. The present Opinion, now guided by significant direct Supreme Court authority, should not be read as if there is no validity to the opposing view. I said precisely the same thing in the first Opinion. It is a fact that both views can be supported by sound arguments put forth by people who sincerely believe in total racial equality; and indeed, it is that truth that makes the area of affirmative action solutions so difficult. Any perpetuation of past discrimination, and the failure to remedy the effects thereof, deny to the victims the fair treatment to which they are entitled. At the very same time, some affirma-tive action plans may unfairly disadvantage those who bear no responsibility for past or present discrimination. This presents the classic dilemma which generates the problems that are inherent and are frequently buried in the phrase "affirmative action."

And as will be seen hereafter, the Supreme Court has now said with clarity of principle but with great confusion of application, that some affirmative action programs provide enough progress toward eliminating past and present discrimination and, at the same time do not disadvantage innocent people too much, that such programs are valid and are upheld on the rubric of being constitutional. The Supreme Court also has stated that other affirmative action programs are not sufficiently effective to achieve the goal of eliminating past and present discrimination to outweigh the injustice visited on persons bearing no personal responsibility for such discrimination. The fact that over time there have been two contrary Opinions by one trial judge demonstrates only how murky is the area. The murkiness is further demonstrated by the fact that both Opinions are entered with recognition that there is much to be said for a contrary result. Men and women of good will face a continual struggle to find the right balance in the affirmative action area. What this Opinion hopefully reflects is the current view of the Supreme Court as to the proper balance between the two views and the principles that should be applied to determine the validity of such affirmative action programs. Without question, the boundary between constitutional and unconstitutional programs is vague, and what creates even more problems is the shifts in society as it struggles to accommodate both valuable objectives—remedying and eliminating racial injustice and not placing the burden of such a remedy on innocent parties.

The struggle of people of good faith is demonstrated by the history of this case. Those who must make the hard decisions hope that those who do not have to make those decisions have the understanding that the drawing of lines in this ever shift-ing society is most difficult. *It cannot be*

*less for whenever people are classified by race, either to discriminate or to eliminate discrimination, the common bond of equal and shared humanity is destroyed.*

## MEMORANDUM OPINION AND ORDER

Before the Court are cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court now grants the plaintiff's Motion for Summary Judgment.

In 1980, plaintiff Stuart Marsh, a white employee of the Flint Board of Education, brought an action to challenge certain contract provisions of the Flint Master Teacher Contract, which function as an affirmative action plan.[1] The plaintiff challenged the contract provisions as being in violation of the Equal Protection Clause of the Constitution. This Court ruled against him upholding the plan. An appeal was taken and the Sixth Circuit affirmed. The Supreme Court 476 U.S. 1137, 106 S.Ct. 2240, 90 L.Ed.2d 688 granted certiorari, vacated the decision below and remanded the case for further consideration in light of its recently-decided case, *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). Once again before the Court are the defendants, the United Teachers of Flint ("UTF"), the Flint Board of Education ("Board"), Leo

Macksood, the president of the Board, and the plaintiff, Stuart Marsh.

Marsh was an employee of the Flint Board of Education from 1965 to 1986, during which time he worked, first, as a high school teacher and then, as a counselor. In 1969, Marsh moved from the classroom to a counseling position. Marsh worked as a counselor until 1980, then the affirmative action plan in dispute went into effect. As per the plan, black employees with less seniority than Marsh were retained as counselors, while Marsh and three other white counselors were involuntarily transferred to teaching positions.

The issue in this case is whether the Supreme Court's adoption of a strict scrutiny standard in reviewing racial classifications for voluntary affirmative action by public employers renders the plan violative of the Fourteenth Amendment. This Court believes that it does.

In *Wygant*, white teachers were laid off by the Jackson School System under the terms of a contract providing that the goal of minority hiring "shall be to have at least the same percentage of minority racial representation on each individual staff as is represented by the student population of the Jackson Public Schools." *Wygant v. Jackson Board of Education*, 546 F.Supp. 1195, 1198 (E.D.Mich.1982) (quoting Jackson teachers' contract, art. VII D.1). When

---

1. The pertinent parts of Article XVI read:

   It is understood that should the Board determine to reduce staff among positions requiring more than a work year of thirty-nine (39) weeks as determined by the teacher's individual contract of employment (e.g., academic counselors, librarians) said reduction will be made in accord with the provisions of article XVI F–1; –2; –3 (herein defined for 30 week employees for purposes of lay-off from 40 week employment to 39 week employment as a plus five percent from the ratio of minority teachers to majority teachers in the secondary level teacher labor pool in existence at the time of lay-off); –5 and Provision G, subject to the following limitations:

   A teacher assigned to one of the aforesaid positions and who is laid off from a 40 week position and transferred into a 39 week position under Provisions (F) and (G) of this Article shall be granted an extra week's work in some appropriate capacity for one (1) year subsequent to the layoff.

   The above provision will not be used to circumvent seniority (e.g., laying off a more senior minority counselor to retain a less senior minority counselor).

   Additionally, if the area reduced is restaffed (moving toward the number the area was before the decrease) district wide, the teacher(s) transferred out shall be guaranteed return to the area on the basis of seniority (last out, first back) for a period of three years.

   Article XVI F–1; –2; –3 and –5 provide:

   Should involuntary transfers be found to be necessary, the selection of such teachers to be involuntarily transferred shall be determined on the basis of the following criteria:

   1. District overall instructional needs;
   2. Teacher certification and qualifications;
   3. Affirmative action goals;
   4. Uninterrupted systemwide seniority (service in the Flint School System).

layoffs became necessary, white teachers were laid off while minority teachers with less seniority were retained. The district and appellate courts found that the racial preference was permissible under the Equal Protection Clause as an attempt to remedy societal discrimination by providing role models for minority children. The Supreme Court reversed holding that the layoff provision violated the Equal Protection Clause.

■ In a plurality opinion, the Supreme Court rejected societal discrimination, in particular the role-model theory, as a predicate for the race-preferential affirmative action plan. The Court adopted the strict scrutiny approach for *all* racial classifications, rather than the reasonableness standard that had been applied by the lower courts. The strict scrutiny standard, as articulated in *Wygant*, requires that a racial classification be justified by a compelling state purpose and be narrowly tailored. 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986).

■ To determine whether the Flint plan is constitutionally valid, the determination must be made whether the racial classification is justified by a compelling state purpose. It has long been established that remedying past discrimination is a sufficiently-compelling state purpose. *United States v. Paradise*, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987). The defendants, however, have denied that the racial composition of the public school staff is due to past discrimination on their part.[2] Any remedial purpose the plan was intend-

ed to have, therefore, must have been aimed at remedying societal discrimination —"discrimination not traceable to ['the defendants'] own actions." *Wygant*, 476 U.S. at 288, 106 S.Ct. at 1854. Societal discrimination alone, however, is not a sufficiently-compelling state purpose to justify a racial classification. *Wygant*, 476 U.S. at 276, 106 S.Ct. at 1848.

■ Even should the Court allow the defendants to concede that they discriminated, that concession would have to be supported by convincing evidence of discrimination against blacks seeking counseling positions. The defendants must present material factual evidence that they discriminated in the past against the group they now favor. *Michigan Road Builders v. Milliken*, 834 F.2d 583, 589 (6th Cir. 1987). The defendants' evidence does not support an inference of prior discrimination.[3] All of the statistics offered focus on showing a disparity of black counselors as compared to the black student population.[4] This is not the proper comparison. In *Wygant*, the Court wrote, "the disparity between the percentage of minorities on the teaching staff and the percentage of minorities in the student body is not probative of employment discrimination." *Wygant*, 476 U.S. at 294, 106 S.Ct. at 1854. To prove the existence of discrimination, the defendants must present statistical evidence which compares the racial composition of the district's counseling staff to the racial composition of the qualified school counselor population in the relevant labor market. *Hazelwood School District v. United*

2. The defendants cannot benefit from the newly-adopted claim that they discriminated in the past. As stated in *Wygant*, "Nor can the [Board] unilaterally insulate itself from this key constitutional question by conceding that it has discriminated in the past, now that it is in its interest to make such a concession." 106 S.Ct. at 1849 n. 5. The defendant's evidence does not support a finding of past discrimination.

3. The district was in compliance with the teacher ratio requirements of *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir.1969), in 1977, and Administrative Judge Mast found that there was no discrimination in employment. (Exhibit 7, p. 114).

4. The defendants' evidence focuses on the ratio of black staff to black students. The emphasis placed on this improper comparison is apparent in the defendants' Affidavit in Support of Summary Judgment, section 10. Defendants' Exhibits 8, 9 and 10 chart the racial distribution of staff and students from 1950 to 1970. In the 1982–83 academic year, the defendants offered the following statistics as evidence of past discrimination: COUNSELORS—34 percent black, 66 percent white; TEACHERS—32 percent black, 67 percent white; STUDENTS—61 percent black; 34 percent white. UTF members were informed in a union newsletter that the plan would continue until "the percent of staff majority/minority equaled the student body majority/minority ratio." Exhibit "G" p. 2.

*States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *J. Edinger & Son, Inc. v. City of Louisville, Ky.,* 802 F.2d 213 (6th Cir.1986).

■ Other than societal discrimination, the defendants have alleged several other interests to support the adoption of the plan. The assignment of one black counselor to each of the secondary schools, however, does not rise to the level of a compelling state interest when justified by the role model theory,[5] the racial preference of students or some amorphous educational benefit.[6]

■ The second prong of the test requires that the plan be narrowly tailored to further the compelling state interest. Assuming that the racial classification is justified, the plan still falls short of meeting the strict scrutiny standard because it is not narrowly tailored. The Supreme Court has expressed concern over the burden that a preferential-layoff scheme imposes on innocent parties. *See Firefighters v. Stotts,* 467 U.S. 561, 574–76, 578–79, 104 S.Ct. 2576, 2585–86, 2587–88, 81 L.Ed.2d 483 (1984); *see also Steelworkers v. Weber,* 443 U.S. 193, 208, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979). The Court has found that the use of hiring goals to further minority employment does not impose the same kind of injury as plans calling for layoffs. "[L]ayoffs impose the entire burden of achieving racial equity on particular individuals, often resulting in serious disruption of their lives." *Wygant,* 476 U.S. 267, 283, 106 S.Ct. 1842, 1851. Like layoffs, involuntary transfers also can result in a serious disruption of an innocent party's life. Here, for example, the plaintiff was transferred to a teaching position. He had not taught for eleven years. Some of the subjects he was required to teach after the transfer, he had never taught. Although the contract allowed him to retain his seniority for purposes of counseling, his accumulated seniority with the Board did not transfer over to teaching. Marsh was treated as the new teacher on the staff. He was required to split his work day between two schools. As the composition of the counseling staff changed, Marsh was jockeyed back and forth between jobs. In addition, the teaching position came with a reduction in annual pay.

The plan has another flaw. The goal of the plan has no relation to remedying discrimination. In *Wygant,* the Court wrote, "[b]ecause the layoff provision here acts to maintain levels of minority hiring that have no relation to remedying employment discrimination, [the plan] cannot be adjudged 'narrowly tailored' to effectuate its assert-

**5.** The role model theory was repudiated in *Wygant.* Of it the court wrote, "The role model theory allows the Board to engage in discriminatory hiring and layoff practices long past the point required by any legitimate remedial purpose.... Moreover, because the role model theory does not necessarily bear a relationship to the harm caused by prior discriminatory hiring practices, it actually could be used to escape the obligation to remedy such practices by justifying the small percentage of black teachers by reference to the small percentage of black students. *Wygant,* 476 U.S. 267, 276, 106 S.Ct. 1842, 1848 (citations omitted).

**6.** The Court in *Wygant* wrote that "[c]arried to its logical extreme, the idea that black students are better off with black teachers could lead to the very system the Court rejected in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)." *Wygant,* 476 U.S. 267, 276, 106 S.Ct. 1842, 1848. Similarly, the idea that black students are better off with black counselors must be rejected. This is not to decide whether there are educational benefits to black-on-black counseling. The numerous scholarly articles submitted to the Court by no means conclude that black-on-black counseling offers educational benefits. Rather, the studies are contradictory. In light of the divergent views of scholars and the clear precedent established in *Brown v. Board of Education,* this Court finds that there is no educational benefit of black-on-black counseling that rises to the level of a compelling state interest. *See Oliver v. Michigan State Board of Education,* 508 F.2d 178 (6th Cir.1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975), *disapproved on other grounds, Dayton Board of Education v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed. 2d 720 (1979), *reh. denied,* 444 U.S. 887, 100 S.Ct. 186, 62 L.Ed.2d 121 (1979); *NAACP v. Lansing Board of Education,* 429 F.Supp. 583 (W.D.Mich.1976), *aff'd,* 559 F.2d 1042 (6th Cir. 1977), *cert. denied,* 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977) (assigning black employees to schools with greater black populations creates and strengthens the racial identification of certain schools as black, thus perpetuating a dual school system).

ed purpose." 476 U.S. 267, 294, 106 S.Ct. 1842, 1857. Similarly, the Flint contract provisions work to maintain levels of minority counselors relative to the minority student population. Therefore, even if the purpose were to be found legitimate, the Flint plan does not meet constitutional muster because the plan is not sufficiently-narrowly tailored.

For the reasons set forth in the briefs and supplemental materials, the Court finds that the plaintiff is entitled to judgment as a matter of law. The contract provisions in question are null and void because they violate the plaintiff's right to equal protection. IT IS HEREBY ORDERED that plaintiff's Motion for Summary Judgment is GRANTED. The Court orders the Clerk of the Court to enter judgment for the plaintiff.

### EPILOGUE

Almost a quarter of a century ago, as a State Circuit Judge, I decided that the United States Constitution prohibited states from enforcing a racial restriction in an ownership certificate for a cemetery lot.[7] It is a tribute to our progress that an argument made in that case by the supporters of the racially-restricted covenant could not be made today. The Cemetery Association asserted, in justification for the restriction against the burial of blacks in this cemetery, the "contention that such restrictive covenants would not deny equal protection of the laws because such covenants could be used to restrict ownership, use or occupancy of whites, orientals, Indians, et cetera, as well as Negroes."[8] In that opinion, almost a quarter of a century ago, that argument was destroyed by a quotation from the United States Supreme Court which bears repeating here: "The rights created by the First Section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights are

personal rights. It is therefore, no answer to these petitioners to say that the Courts may also be induced to deny white persons' rights of ownership and occupancy on grounds of race or color. Equal protection of the laws is not achieved through indiscriminate imposition of inequalities."[9] The United States Supreme Court in *Wygant* has told us that such an indiscriminate imposition of inequalities as imposed in this case deny equal protection. A quarter of a century has passed in an instant.

---

7. *Spencer v. Flint Memorial Park,* 4 Mich.App. 157, 144 N.W.2d 622 (1966) adopting verbatim my opinion rendered in the trial court.

8. An argument asserted in the famous restrictive covenant case of *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

9. *Spencer,* 4 Mich.App. at 164, 144 N.W.2d 622, *quoting Shelley v. Kraemer,* 334 U.S. at 22, 68 S.Ct. at 846.