Fannie BALL, et al., Plaintiffs,

v.

**UNION CARBIDE CORPORATION, et al., Defendants.**

Steven L. Heiser, et al., Plaintiffs,

v.

**Union Carbide Corporation, et al., Defendants.**

Nos. 3:01–CV–22, 3:01–CV–37.

United States District Court, E.D. Tennessee, at Knoxville.

Sept. 17, 2002.

George E. Barrett, Jacqueline O. Kittrell, Edmund L. Carey, Jr., Barrett, Johnston & Parsley, Cecil D. Branstetter, Branstetter, Kilgore, Stranch & Jennings, Richard H. Dinkins, Dodson, Parker, Dinkins & Behm, PC, Nashville, TN, Joe R. Whatley, Jr., Whatley Drake, LLC, Birmingham, AL, Steven E. Cauley, Curtis L. Bowman, Cauley, Geller, Bowman & Coates, LLP, Little Rock, AR, Jack Reise, Paul J. Geller, Howard K. Coates, Cauley, Geller, Bowman & Coates, LLP, Boca Raton, FL, Brian P. Coluccio, Short, Cressman & Burgess, PLLC, Seattle, WA, Mitchell A. Toups, Weller, Green, Toups & Terrell, LLP, Beaumont, TX, Dennis C. Reich, Reich & Binstock, Houston, TX, John G. Emerson, Jr., Emerson Firm, Little Rock, AR, for plaintiffs.

Edwin H. Rayson, Jr., Thomas M. Hale, Kramer, Rayson, Leake, Rodgers and Morgan, John T. Buckingham, U.S. Department of Justice, Office of U.S. Attorney, Knoxville, TN, for defendants.

## MEMORANDUM OPINION

JARVIS, District Judge.

These two putative class actions arise out of claims of dangerous exposure to radioactive and other toxic substances in Oak Ridge, Tennessee, and surrounding areas over the more than 50 year period that atomic bombs were manufactured there. Plaintiffs claim to have been exposed to a vast number of toxins including: plutonium–239/240, tritium (H–3), uranium–233, uranium–235, iodine–131, iodine–133, cesium–137, strontium–90, krypton–85, mercury, lead, cadmium, cesium, and beryllium. [Court File Nos. 1, 30]. The plaintiffs also claim that they have contracted or been at risk for contracting a vast number of diseases including:

Leukemia (except CLL)

Thyroid cancer

Thyroid nodule (includes adenomas, colloid nodules and multinodular goiter)

Breast cancer

Esophageal cancer

Stomach cancer

Small intestinal cancer

Pancreatic cancer

Gall bladder cancer

Liver cancer

Salivary gland (oral cavity) cancer

Urinary bladder cancer

Brain & CNS cancer

Colon cancer

Ovarian cancer

Bone cancer

Kidney cancer

Uterine cancer

Trachea, bronchus & lung cancer

Prostrate cancer

Hypothyroidism

Hyperparathyroidism

Autoimmune thyroiditis (including Hashimoto's thyroiditis)

CBD

ABD

Berylliosis

[Court File # 30]. These actions arise out of the same alleged course of conduct by the defendants and the same attorneys represent the plaintiffs in both actions. Furthermore, the *Ball* case, Civ. No. 3:01–CV–22, appears to be a subclass of *Heiser*, Civ. No. 3:01–CV–37. Accordingly, to avoid repetition, the court will address all pending motions in both cases in this single memorandum opinion.

### I.

#### Pending Motions

In *Heiser*, currently pending are the defendants' motion to dismiss for failure to

state a claim upon which relief can be granted and the plaintiffs' motion for class certification [Court Files No. 33, 50]. In *Ball,* currently pending are the contractor defendants' motion to dismiss for failure to state a claim upon which relief can be granted, the federal defendants' motion to dismiss for lack of subject matter jurisdiction, lack of *in personam* jurisdiction, insufficiency of service of process, and failure to state a claim upon which relief can be granted, and the plaintiffs' motion for class certification [Court Files No. 33, 39, 69].

## II.

### *Procedural History*

Although the plaintiffs have considerably narrowed their proposed classes, a review of the procedural history of these cases exposes a not-so-subtle attempt by the plaintiffs' counsel to capture some certifiable class out of a plethora of conceivable plaintiffs and claims arising out of the Oak Ridge Reservation and is helpful to understanding the pending motions.

In the original *Heiser* complaint filed in January 2001, the plaintiffs proposed perhaps one of the largest classes ever certified. Paragraph 3.2 of the complaint identified as plaintiffs:

[F]ormer employees of Defendants; frequenters or invitees, who regularly transacted business in Oak Ridge; residents of the town of Oak Ridge; persons who lived downstream or downwind from Oak Ridge; or the children of such people.

[Court File # 1]. The distance "downstream or downwind" is not defined. Nor are the "frequenters or invitees" who "regularly transact business in Oak Ridge". However, the plaintiffs further proposed that the class be subdivided into three subclasses.

Subclass I was comprised of "persons who lived in Oak Ridge, Tennessee, or otherwise resided within a geographic area under Defendants' control." The geographic area was not identified nor was the time period involved.

Subclass II, the "Personal Injury Subclass," was comprised of "persons who pres-

ently have a disease caused by the Defendants' conduct and who are not members of Subclass I." The diseases apparently include all of those listed above.

Finally, Subclass III, the "Medical Monitoring Subclass," was comprised of "persons who are not members of Subclass I or II, who have an increased risk of contracting disease caused by Defendants' actions at Oak Ridge and thus require medical monitoring." Again, no geographic limitations were suggested nor was there any identification of the "medical monitoring" that might be involved.

Apparently recognizing the incredible breath and the ambiguity of the original complaint, the *Heiser* plaintiffs then filed an amended complaint in which they suggested the following subclasses.

Subclass I(A) included

[P]ersons who lived in Oak Ridge, Tennessee or otherwise resided in a nearby geographic area under the influence of the Defendants from 1943 to the present who have either thyroid cancer or thyroid nodule(s).

Subclass I(B) included

[P]ersons who lived in Oak Ridge, Tennessee, or otherwise resided in a nearby geographic area under the influence of the Defendants from 1943 to the present who have other diseases of the thyroid gland attributable to the Defendants' conduct.

Subclass II was expanded to include

"[P]ersons who lived in Oak Ridge, Tennessee, or otherwise resided in a nearby geographic area under the influence of the Defendants from 1943 to the present who have other cancers or noncancerous diseases specified by the Act establishing the Energy Employees Occupational Illness Compensation Program (EEOICP); including any radiogenic cancer or 'specified cancer' or 'established chronic beryllium disease' as defined by Section 3621 of that Act, or any cancer or other disease specified by 38 C.F.R. § 3.311, as listed in Exhibit A hereto."

Exhibit A includes the twenty-six diseases listed by the plaintiffs.

Subclass III was changed to include

[P]ersons who lived or live in or near Oak Ridge, Tennessee, who have other cancerous or noncancerous diseases (including but not limited to metals toxicity or other elemental poisoning) that was caused or substantially contributed to by Defendants' conduct, or who have a heightened risk of susceptibility to such diseases or toxicities caused or substantially contributed to by Defendants' conduct.

Subclass IV, the "Oak Ridge Notice Subclass," was comprised of

[M]embers of Subclasses I(A), I(B), and/or III who currently reside in the general Oak Ridge geographic area.

Subclass V, the "Non–Oak Ridge Notice Subclass," was comprised of

[M]embers of Subclasses I(A), I(B), and/or III who once lived in the general Oak Ridge area but no longer do so, and currently reside elsewhere.

Finally, Subclass VI, the "Medical Monitoring Subclass," included

[P]ersons who are members of Subclass I, II, and/or III, and who have an increased risk of contracting disease caused or substantially contributed to by Defendants' actions at Oak Ridge and thus require medical monitoring.

Finally, at the request of the court, the plaintiffs filed a motion for class certification in which they once again redefined the proposed class to seek certification of a class comprised of

[P]ersons who lived in Oak Ridge, Tennessee, or otherwise resided in a nearby geographic area under the influence of the Defendants from 1943 to the present who have not yet contracted thyroid cancer but who have been exposed and put at risk by Defendants' act.

[Court File # 50]. The plaintiffs attempted to limit the class as follows:

The geographic area appropriate to class certification is a 50 kilometer (31 mile) radius from the Oak Ridge National Laboratory (also known as "X–10").

However, the plaintiffs never amended their complaint to identify this third proposed class. Therefore, based on the pleadings, it is difficult to ascertain exactly what classes the plaintiffs wish to pursue, if any, beyond that identified in the memorandum in support of their motion for class certification.

In the complaint and amended complaint, the *Heiser* plaintiffs allege twenty-two causes of action including: violation of the substantive due process right to bodily integrity, violation of the substantive due process right to access to the courts, denial of procedural due process violations, equal protection violations, conspiracy to violate the United States Constitution, violation of rights under the Tennessee Constitution, negligence, strict liability for abnormally dangerous activity, trespass, nuisance, misrepresentation and fraud, intentional infliction of emotional distress and outrageous conduct, negligent infliction of emotional distress, assault, battery, breach of contract, unjust enrichment, concert of action, medical monitoring, increased risk and fear of disease, and civil conspiracy [Court Files No. 1, 30].

The original complaint in *Ball,* filed in January 2001, defined the proposed class as

[A]ll African American persons who have resided in the Scarboro community in Oak Ridge.

[Court File # 1]. The *Ball* plaintiffs then filed an amended complaint in which they redefined the proposed class as

[A]ll African American persons who reside in, or have resided in, the Scarboro community in Oak Ridge.

The plaintiffs further suggested that this class be subdivided into the following subclasses.

Subclass (a) included

[A]ll persons of African–American descent who currently live in Scarboro.

Subclass (b) included

[A]ll persons of African–American descent who have lived in Scarboro in the past, but no longer do so.

Finally, subclass (c) included

[A]ll persons in subclasses (a) and (b) who may benefit from medical monitoring.

At the request of the court, the *Ball* plaintiffs filed a motion for class certification in

which they again changed the proposed class to include

[A]ll individuals of African American descent who currently live in and/or currently own property in Scarboro and/or once lived in the Scarboro community and continue to frequently visit the Scarboro community.

[Court File # 68]. Like the *Heiser* plaintiffs, the *Ball* plaintiffs never amended their complaint to reflect the redefined class. As a result, the court is again uncertain as to the precise class the *Ball* plaintiffs wish to have certified, and if the plaintiffs intend to later seek certification of other classes as suggested in their compliant and amended complaint.

In their complaint and amended complaint, the *Ball* plaintiffs allege discrimination pursuant to 42 U.S.C. §§ 1981, 1982, 1983, 1985(3), 2000(d), 3604. The plaintiffs also allege that defendants failed to eliminate the vestiges of such discrimination pursuant to *Freeman v. Pitts*, 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). The *Ball* plaintiffs' other causes of action include claims for violations of the Tennessee Constitution, negligence, medical monitoring, and declaratory and injunctive relief.

## III.

### *Factual Background*

The following factual allegations are considered in the light most favorable to the plaintiffs.

### A.

### *The Manhattan Project, Department of Energy, Atomic Energy Commission and its General Contractors*

The federally owned Oak Ridge Reservation ("ORR") was established by the Army Corps of Engineers in 1942 as headquarters for the Army's Manhattan Engineering District ("MED") which served as an essential part of the nation's program to develop the world's first atomic bomb. The ORR originally encompassed 59,000 acres of remote land along the Clinch River in eastern Tennessee, about 30 miles west of Knoxville, and consisted of three main production areas, code named Y–12, K–25, and X–10, that were each located in a separate valley and in the area that eventually became the community of Oak Ridge. The Y–12 plant originally produced enriched uranium using an electromagnetic process that separated minute quantities of the fissionable isotope uranium–235 from natural uranium. However, after the war this process was abandoned, but as the Cold War progressed and intensified, the Y–12 plant began producing other nuclear weapon components. The K–25 plant also produced enriched uranium, but by using a gaseous diffusion process rather than the electromagnetic process used at Y–12. In 1987, the Department of Energy ("DOE") decided to permanently shut down all of the gaseous diffusion operations in Oak Ridge, and the K–25 plant, now known as "East Tennessee Technology Park," currently houses private sector tenants. The X–10 plant was designed to demonstrate the production of plutonium from uranium fuel to lay the groundwork for the full-scale plutonium production facilities built at another Manhattan Project site in Hanford, Washington. However, the X–10 plant has since been renamed Oak Ridge National Laboratory ("ORNL") and is a leading science and technology research center that supports both civilian and military programs.

The United States government built and oversaw the wartime operation of the ORR, and the Atomic Energy Act of 1946 transferred control over production of nuclear power and ownership of all MED property to the newly created Atomic Energy Commission ("AEC"). Since the Act became effective on January 1, 1947, Oak Ridge Operations have been under the control of the AEC and its successor federal agencies, such as the DOE. In addition to federal agencies, several private contractors have at one time operated some or all of the Oak Ridge facility including: the University of Chicago, Monsanto Company, Union Carbide Corporation, Roane–Anderson Company, Management Services, Inc., Eastman Kodak Company (Tennessee Eastman), Eastman Chemical Company, Turner Construction Company, UT–Battelle, LLC, Martin–Marietta Energy

Systems, Inc, Lockheed Martin Energy Systems, Inc., BWXT–12 Company, Inc., and Bechtel James Company, LLC.

## B.

### The History of Oak Ridge

The area that is the current city of Oak Ridge was once a remote area in the northeast corner of the ORR. By 1945, this rural area had grown into a city that was designed to feed, house, and service the daily needs of tens of thousands of civilian workers involved with the design, construction, and operation of the ORR's productions plants, and the military personnel assigned to oversee their work and ensure the security of the Manhattan Project. Accordingly, until 1949 the city of Oak Ridge was closed to the public and could only be accessed though guarded security gates. The passage of the Atomic Energy Community Act of 1955 brought an end to federal ownership and control of Oak Ridge and allowed the city to incorporate as an independent municipality in 1959.

In the early 1940s, African–American workers were recruited from Tennessee and other southern states to work as common laborers, janitors and domestic workers in Oak Ridge as part of the Manhattan Project. Pursuant to the AEC's "Master Plan," these African–American workers were housed in Gamble Valley Trailer Camp, now known as the Scarboro community, which was located near the Y–12 facility on the other side of Pine Ridge. Today Scarboro remains a predominately African–American community in Oak Ridge.

## C.

### The Oak Ridge Health Agreement Steering Panel Study

The Oak Ridge Health Agreement Steering Panel ("ORHASP") was a 12–member panel created in early 1992 pursuant to the Tennessee Oversight Agreement entered into by the Tennessee Department of Health and the DOE in response to public controversy over the release of radioactive and other toxic substances from the Oak Ridge plants and the resulting impact on public health. As part of this agreement the DOE agreed to fund a study of Oak Ridge's environmental releases and the potential off-site health effects. Accordingly, ORHASP was formed to oversee this study, which was conducted by private firms under contract with Tennessee Department of Health.

Phase I of the study was completed in late 1993 and focused on identifying the Oak Ridge contaminants most likely to have off-site health effects and assessing the feasibility of performing a historical dose reconstruction. Phase II of the study began in mid–1994 and was completed in early 1999 and included a full dose reconstruction analysis in addition to health effects screening analyses for several substances that hand not been previously reviewed in Phase I.

The ORHASP's final report was dated December 1999, which is important because this is the date from which the plaintiffs key the running of the statute of limitations. This report identified two groups of people who might have been affected by past releases from the Oak Ridge plants:

> [L]ocal children drinking milk from a "backyard" cow or goat in the early 1950s, and fetuses carried in the 1950s and early 1960s by women who routinely ate fish taken from the contaminated creeks and rivers located downstream of ORR.

ORHASP Final Report at 6. Furthermore, the ORHASP final report also commented on the Oak Ridge community's involvement in the ORHASP study:

> Both the TDH staff and the Panel have been in contact with concerned members of the community throughout the course of the health agreement studies project. These contacts have included numerous public meetings, public availability sessions, and direct public involvement in the Panel's regular business meetings. Every meeting of the Panel has been open to the public and members of the public have been free to make comments and ask questions.

ORHASP Final Report at 68.

## VI.

### The Parties

#### A.

##### The Heiser Plaintiffs

The amended *Heiser* complaint names seven individual plaintiffs as class representa-

tives [Court File # 30]. James Edward Wilder was born in Oak Ridge in 1957 and lived there until 1959. He claims that because of the defendants' actions at Oak Ridge his "constitutional rights were violated, and he is at significant risk of suffering disease including thyroid disease, thyroid and other cancers, and other associated conditions requiring medial monitoring and treatment. [He] also suffered emotional distress because of Defendants' conduct."

Stella Lively Wilder and Elmer William Wilder, now deceased, lived in Oak Ridge from 1951 to 1959 and again in the 1980s. It is claimed that "[a]s a result of Defendant's misconduct at Oak Ridge...[the Wilders'] constitutional rights were violated, and [they] suffered from thyroid cancer and associated conditions requiring medical treatment. [And also] severe physical and mental pain and suffering...."

Carolyn Jean (Wilder) McDowell lived in Oak Ridge from 1951 through 1959 and again from 1967 to 1971. Her claims are identical to those of James Edward Wilder.

Steven Lynn Heiser and Gereldean Burgin Carmichael "[d]uring all times relevant to this lawsuit...lived in geographic proximity to Oak Ridge" and allege that because of the defendants' actions they have "suffered thyroid cancer and associated conditions requiring medical treatment...[and]suffered severe physical injury and general pain and suffering, and severe physical and mental pain and suffering."

Finally, Darlene Melissa Heiser, who also lived in "geographic proximity to Oak Ridge" in the time period "relevant to this lawsuit," claims to be at "significant risk of suffering disease including thyroid disease, thyroid and other cancers, and other associated conditions requiring medical monitoring and treatment."

### B.

#### The Ball Plaintiffs

The amended *Ball* complaint also names seven individual plaintiffs [Court File # 28]. Fannie Ball is described as an African–American resident of Scarboro community in Oak Ridge, Tennessee who "visited Scarboro frequently between 1950 and 1954 and has lived there continuously since 1954." It is also alleged that she "attended school [in Scarboro] and is a home owner and rental property owner in the community."

R.L. Ayers, who is also described as an African–American resident of the Scarboro community, has "lived in Scarboro since 1943....[and] is a property owner in the community."

Minnie Thompson, an African–American resident of Scarboro "has lived in Scarboro since 1949..., was a property owner, and is the daughter and next of kin of Frances Coleman Sharper (deceased), who was an African American resident of Scarboro from 1943 until her death in 1977."

Denise Miller and Arlene Fernander were "born in Oak Ridge and was raised to adulthood in Scarboro, continue[ ] to visit [their] parents in Scarboro, and presently reside[ ] in Alpharetta, Georgia."

Denise M. Anthony was also "born in Oak Ridge and raised to adulthood in Scarboro, and presently resides in Marietta, Georgia. Her parents, Constance Marie Anthony and William Bright Anthony, lived in Scarboro from 1942 to their deaths [in 2000 and 1992] and [allegedly] died from complications of illnesses believed to be caused or substantially contributed to by Defendants."

Finally, Rayshell Anderson was "born in Oak Ridge and grew up in Scarboro, and was a resident of Scarboro until early 2001, when she moved to her present residence just outside of Scarboro in Oak Ridge, Tennessee. She has two minor children who resided in Scarboro from birth until their mother moved in early 2001."

### C.

#### The Defendants

The *Heiser* amended complaint names ten private contractor defendants who were at some time either directly or indirectly involved with operating the Oak Ridge facility [Court File # 30].

The University of Chicago served as an operator of Oak Ridge from 1942–1945.

Monsanto Corporation, either itself or its agents, served as an operator of Oak Ridge from 1945–1947.

Union Carbide Corporation served as the "principal operator" of Oak Ridge from 1947–1984.

Roane–Anderson Company, a subsidiary of Turner Construction Company, was allegedly "responsible for the health and safety services of Oak Ridge, Tennessee, and the public's welfare because Oak Ridge was a 'company town.'"

Management Services, Inc. was an "apparent subcontractor of Roane Anderson and later a contractor of the Atomic Energy Commission with responsibility for the health and safety services of Oak Ridge, and for the public welfare."

Eastman Kodak Company, whose operating unit was the Tennessee Eastman Corporation, operated the Y–12, K–25, and X–10 sites from 1943–1945.

Martin Marietta Energy Systems, a subsidiary of Martin–Marietta Corporation, operated Oak Ridge from 1984–1988 and specifically the Y–12 facility through 2000. After a merger with Lockheed, the newly formed Lockheed Martin Corporation assumed the Oak Ridge operations.

UT–Battelle has been an operator of the Oak Ridge National Laboratory since 2000.

Likewise, BWXT Y–12 has operated the Y–12 facility since November 2000.

Finally, Bechtel Jacobs Company is the "management and integration contractor at Oak Ridge for the Department of Energy responsible for environmental remediation."

In addition to these same defendants, the *Ball* amended complaint also names J.C. Ridenour Co., Inc. as a "subcontractor of Roane–Anderson and responsible for the management of the 'colored' hutments." [Court File # 28].

Furthermore, the *Ball* amended complaint also names the United States government as a party. Specifically, the amended complaint names Secretary of Energy Spencer Abraham, in his official capacity, and alleges that he "has responsibility for Oak Ridge and is the successor to prior responsible officials of the Manhattan Project, the Atomic Energy Commission, the Department of Energy, and many others of its governmental forerunners." The plaintiffs also claim that John A. Gordon, the current Administrator of the National Nuclear Security Administration, is "responsible for management of programs at the Y–12 site, and is successor to prior government managers responsible for the Y–12 site." He is also sued in his official capacity.

## V.

### *Rule 23 Requirements and the Appropriateness of Class Certification of Mass Tort Actions*

Before a class may be certified under Rule 23, the party seeking class certification must establish that the class satisfies all four prerequisites of Rule 23(a) and that the action falls within at least one of the Rule 23(b) subcategories. *In re American Medical Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996). The Rule 23(a) prerequisites are: (1) that the proposed class be so numerous that joinder is impractical; (2) that the plaintiffs establish that there are questions of law or fact common to the class; (3) that the claims of the representative plaintiffs are typical of the claims of the class; and (4) that the named plaintiffs and class counsel are adequate representatives for the class. Fed. R. Civ. Pro. 23(a). In addition to satisfying the requirements of Rule 23(a), the party seeking class certification must also establish that the proposed class action qualifies for class treatment under one or more of the Rule 23(b) subcategories. *Id.* at 1079.

Both the *Heiser* and *Ball* plaintiffs claim the proposed class actions are maintainable under Rule 23(b)(2) which authorizes certification of a class of plaintiffs where the party opposing the class has "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole...." Fed. R. Civ. Pro. 23(b)(2). The *Heiser* plaintiffs further allege that the class is maintainable under Rule 23(b)(3) which requires the court to find "that the questions of law or fact common to the members of the

class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. Rule Civ. Pro. 23(b)(3). The Rule 23(b)(3) predominance requirement is a more stringent requirement than that contained in Rule 23(a) with only mandates that common questions of law or fact exist. *Id.* at 1084.

■ Even assuming the plaintiffs ability to satisfy the requirements of Rule 23, the complex nature of mass tort actions "where no one set of operative facts establishes liability, no single proximate cause applies to each potential class member and each defendant, and individual issues outnumber common issues," demands that the court "properly question the appropriateness of a class action for resolving the controversy." *Id.* at 1084 (quoting *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1196–97 (6th Cir.1988)).

■ Early on, the drafters of Rule 23 recognized the dangers of certification of mass tort actions. The Advisory Committee on the Federal Rules of Civil Procedure stated in 1966 that:

A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.

*Mass Torts and Class Actions: Facing Increased Scrutiny,* 167 F.R.D. 483, 487 (1996). Class certification of "mass accident" torts are even more problematic where, as in the *Heiser* and *Ball* cases, there are multiple defendants, multiple accidents, and multiple claimants. Courts also have historically disfavored class certification for mass tort actions. *See Castano v. American Tobacco Co.,* 84 F.3d 734, 746 (5th Cir.1996) (ordering decertification of nationwide class of nicotine dependant persons); *In re American Medical Sys., Inc.,* at 1087 (granting mandamus to reverse nationwide class certification for pen-

ile prosthesis products liability case); *In re Allied Signal, Inc.,* 915 F.2d 190 (6th Cir. 1990) (rejecting nationwide class of asbestos claimants); *see also In re Rhone–Poulenc Rorer, Inc.,* 51 F.3d 1293, 1304 (7th Cir.1995) (stating that most federal courts refuse to certify mass tort class actions and granting mandamus to decertify a nationwide class of hemophiliacs who had contracted the AIDS virus).

■ Another reason mass tort cases are typically inappropriate for class certification is that they often involve "immature" mass torts. An immature mass tort case is one in which "discovery is commencing or ongoing, there are few, if any, single-plaintiff versus single defendant jury verdicts, and there is no showing of a 'persistent vitality to the plaintiffs' contentions." *Id.* at 493. The Fifth Circuit recently considered the issue of immature torts and voiced concern that:

[A] mass tort cannot be properly certified without a prior record of trials from which the district court can draw the information necessary to make the predominance and superiority analysis required by [R]ule 23. This is because certification of an immature tort results in a higher than normal risk that the class action may not be superior to individual adjudication.

*Castano,* 84 F.3d at 747. Furthermore, as the action matures through individualized trials, "courts and parties can assess the merits and value of the litigation and determine whether the litigation justifies class treatment or satisfies class certification criteria." *Mass Torts and Class Actions,* 167 F.R.D. at 493.

## VI.

### Analysis

■ In assessing whether the *Heiser* or *Ball* plaintiffs have satisfied the Rule 23 requirements for class certification the initial analysis is limited to the last classes identified by the plaintiffs, those identified in their memorandum in support of their motions for class certification, although the plaintiffs have not amended their complaint to reflect the proposed classes. The *Heiser* class last identified by plaintiffs is comprised of:

[P]ersons who lived in Oak Ridge, Tennessee, or otherwise resided in a nearby geographic area under the influence of the Defendants from 1943 to the present who have not yet contracted thyroid cancer but who have been exposed and put at risk by Defendants' act.

The last *Heiser* class is limited as follows:

The geographic area appropriate to class certification is a 50 kilometer (31 mile) radius from the Oak Ridge National Laboratory (also known as "X–10").

The *Ball* class last identified by plaintiffs is comprised of:

[A]ll individuals of African American descent who currently live in and/or currently own property in Scarboro and/or once lived in the Scarboro community and continue to frequently visit the Scarboro community.

It is these two proposed classes which the court will first address.

For the class proposed by the *Heiser* plaintiffs to be certified it must first meet the four requirements of numerosity, commonality, typicality, and fair and adequate representation contained in Rule 23(a). The court concedes that the plaintiffs have satisfied the numerosity requirement because the proposed class is sufficiently numerous that joinder would be impractical. However, since the proposed class is so expansive the plaintiffs cannot satisfy the commonality requirement because there are multiple issues not common to all class members. For example, the plaintiffs have varying periods of residency in the Oak Ridge area, different levels of exposure, and there are multiple defendants and defenses for each individual claim. Furthermore, the plaintiffs have not demonstrated that the claims of the individual class representatives are typical of the claims of the class as a whole because many of the class members were not even living in Oak Ridge in the 1950s, which is when the most significant emissions complained of occurred.

In addition, none of the individual class representatives has alleged to be in the groups at highest risk of exposure, namely those who drank "contaminated milk from a backyard from 'backyard' dairy animals (i.e.,

a local family milk cow or goat) that grazed pastures contaminated during the period [from September 1944 to October 1956]" or "fetuses carried in the 1950s and early 1960s by women who routinely ate fish taken from the contaminated creeks and rivers located downstream of the ORR." ORHASP Final Report at 6, 10. The individual plaintiffs also have different interests regarding damages. For example, two of the named plaintiffs have thyroid cancer while others only claim to be "at significant risk of suffering disease including thyroid disease, thyroid and other cancers, and other associated conditions requiring medial monitoring and treatment." [Court File # 30]. Thus, at least two named plaintiffs are not even members of the plaintiffs' proposed class. Finally, the class representatives will not fairly and adequately represent the interests of the class because even in the limited monitoring class that the plaintiffs propose, there are potential plaintiffs with many different levels of exposure with different needs for medical monitoring. For example, a potential plaintiff who worked for many years at the Y–12 plant and lived one mile downstream would have a completely different need from a non-employee who lived twenty-five miles upstream for only a brief period of time.

■ In addition to satisfying the Rule 23(a) requirements, for the proposed *Heiser* class to be certified, the plaintiffs must show that the proposed class action qualifies for class treatment under one or more of the Rule 23(b) subcategories. *In re American Medical Sys., Inc.,* 75 F.3d at 1079. The *Heiser* plaintiffs claim the proposed class action is maintainable under Rule 23(b)(2) and 23(b)(3). However, the plaintiffs are not really seeking equitable relief as envisioned by Rule 23(b)(2), and in fact, the plaintiffs demand for relief is primarily in the form of money damages because in addition to demanding the creation of a medical monitoring fund, they are demanding compensatory and punitive damages for such claims as negligence, trespass, nuisance, fraud, intentional and negligent infliction of emotional distress, assault, battery, breach of contract, unjust enrichment, and increased risk and fear of disease. The Sixth Circuit recently discussed the issue of class certification un-

der Rule 23(b)(2) and suggested that "certification of a 23(b)(2) class turns on whether the injunctive and/or declaratory relief sought on behalf of the class 'predominates[s]' relative to any incidental monetary damages requested." *Butler v. Sterling, Inc.*, 210 F.3d 371, 2000 WL 353502 at *6 (6th Cir.2000) (upholding the district court's denial of class certification under Rule 23(b)(2) because the primary relief sought by the plaintiffs was monetary relief). Accordingly, the proposed *Heiser* class cannot be maintained under Rule 23(b)(2).

■ Nor can the proposed *Heiser* class be maintained under Rule 23(b)(3) because common questions of law or fact do not "predominate over any questions affecting only individual members." Fed. Rule Civ. Pro. 23(b)(3). Issues relating to exposure will vary greatly among the class members depending on a variety of individualized factors such as time, level, and duration of exposure, family medical history, dietary habits, age, and place of residence. Likewise, the various defendants' liability will also depend on individualized evidence and will vary widely among different members of the class.

■ Like *Heiser*, the proposed *Ball* class is also not maintainable under Rule 23. Although the court concedes that the numerosity requirement has been satisfied, the plaintiffs cannot prove commonality, typicality, or fair and adequate representation. In their memorandum in support of their motion for class certification the *Ball* plaintiffs claim the commonality requirement is satisfied because "the focus of the litigation will be on a general policy, such as discrimination, of the Defendant. . . . At its heart the case is about the common issues of whether the Defendants. . . engaged in *de jure* segregation, and if so, whether there are present vestiges of that segregation." [Court File # 70]. Even if it is assumed there are common issues with regard to *de jure* segregation and whether vestiges of that segregation remain in Scarboro, those questions do not predominate over the innumerable individualized questions that would exist with respect to each plaintiff. Each member of the proposed class lived in Scarboro for a discrete period of time and was exposed to mercury or other

toxins in a discrete way. Some may have lived there for fifty or more years and some for a week or less. Some were there in the late 1950s when emissions were greatest and some were not. A few may have consumed milk from a backyard farm animal in the 1950s, most did not. As in *Heiser*, each individual plaintiff, if he or she has a claim, has a highly individualized claim based his or her total exposure time, exposure period, medical history, diet, sex, age, and a myriad of other factors. The court finds that the individualized issues far outweigh any common ones.

Furthermore, I cannot find that the claims of the individual representative plaintiffs in *Ball* are typical of those of the class members in general. Plaintiff Ayers is described as a property owner in Scarboro. Thus her alleged damages in the purported loss of value of her property is different from that of many of the non-property owners. Ms. Thompson has lived in Scarboro since 1949. Accordingly, her period of potential exposure is much longer than that of the average proposed plaintiff. Plaintiffs Miller, Fernander, and Anthony were born and raised in Scarboro, but they now reside just outside Scarboro. It is apparent from the variety of plaintiffs, in terms of damages and exposures, that there is no "typical" Scarboro resident for purposes of Rule 23. Rather each represents a discrete individualized claim which is particularly inappropriate for handling in a class setting. I also find that they plaintiffs have failed to satisfy the "typicality" requirement of Rule 23.

In addition to the factors discussed above, many courts have recognized additional requirements for class certification. For example, it is implicit in the language of Rule 23 that for a proposed class to be certified a class must exist and the class representatives must be members of the proposed class. 5 Moore's Federal Practice § 23.21[1] (3rd ed.1997). Accordingly, before a class can be certified, "the class description must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class. . . . [F]or the proposed class to be sufficiently defined, the identity of the

class members must be ascertainable by reference to objective criteria." *Id.* The class members must be readily identifiable in order to provide proper notice to potential class members and to avoid preclusion issues. *See id.* This basic requirement is not satisfied in either *Heiser* or *Ball* because the proposed class description is so vague that it will be impossible to identify potential class members.

### VII.

### *Other Potential Claims of Which the Plaintiffs Have Not Chosen to Seek Certification*

In their memorandum in support of their motion for class certification, the *Ball* plaintiffs have attempted to reserve the right to create subclasses of: "(a) All persons of African American descent who currently live in Scarboro; (b) All persons of African American descent who have lived in Scarboro in the past, but no longer do so; [and] (c) All persons in subclasses (a) and (b) who may benefit from medical monitoring." [Court File # 69]. Although the *Ball* plaintiffs have not chosen to seek certification of these subclasses, it appears that the plaintiffs' counsel, if they fail to obtain certification of the classes identified in their memoranda, may seek certification of other classes previously identified or subclasses thereof. Accordingly, the court will also briefly address the other potential classes mentioned by the plaintiffs in their complaints and amended complaints.

The original *Heiser* complaint identified the plaintiffs as

[F]ormer employees of Defendants; frequenters or invitees, who regularly transacted business in Oak Ridge; residents who lived downstream or downwind from Oak Ridge; or the children of such people.

Thirteen separate defendants operated the Oak Ridge facility for a more than fifty year period. The plaintiffs have listed fifteen separate toxins which may have escaped the Oak Ridge facilities during that period. A few of the times when a specific toxin may have escaped are known, but the vast majority are unknown, if they in fact occurred. Some were allegedly by air, some by land, and some by water. The effect that these emissions may have had is unknown, and by any modern scientific standards, unknowable. Only one disease, thyroid cancer, has been linked in any way with the emission of one toxin, iodine–131, during a limited period in the 1950s, and the persons threatened by an increased risk of thyroid cancer has been limited so far to those individuals who drank "contaminated milk from a backyard from 'backyard' dairy animals (i.e., a local family milk cow or goat) that grazed pastures contaminated during the period [from September 1944 to October 1956]" or "fetuses carried in the 1950s and early 1960s by women who routinely ate fish taken from the contaminated creeks and rivers located downstream of the ORR." ORHASP Final Report at 6, 10. The plaintiffs have been unable to name a single individual plaintiff who would fall within this class, much less qualify as a class representative for a larger group.

The original class of plaintiffs named in the original *Heiser* complaint would undoubtedly be the largest class ever certified by a court. It would conceivably include everyone who has been to Oak Ridge or a "surrounding area" or downwind or downstream of that area within the last fifty years. The plaintiffs suggest this could be hundreds of thousands of people. More realistically, it would constitute millions. Such a class action would obviously be a judicial and administrative nightmare. The claims of each of the millions of plaintiffs would be as different as the medical and life histories of each of the plaintiffs. As the Advisory Committee noted in 1966, Rule 23 is not to be used to litigate such mass torts when each individual claimant might have different damages and each defendant has different defenses affecting each plaintiff in different ways. Such a lawsuit could only degenerate into multiple individual lawsuits.

The *Ball* complaint seeks to narrow the *Heiser* class by limiting it to African–American residents of Scarboro. However, the *Ball* complaint is similarly overbroad and suffers the same problems as *Heiser*. Each of the potential tens of thousands of *Ball* plaintiffs also has a precise individual claim,

if he or she has a claim. Certification of such a class could only degenerate into multiple individual claims.

The plaintiffs' counsel is obviously aware of the overwhelming obstacles to obtaining class certification in either of these actions. Otherwise, there is no explanation for their repeated attempts to redefine and limit the classes they seek to certify. This raises the specter that the plaintiffs' counsel are simply fishing to obtain a certifiable class. Courts are aware that class actions are sometimes filed, not to obtain relief for suffering class members, but to disgorge attorney's fee settlements from deep pocket defendants. I do not suggest that this is the motive of the plaintiffs' counsel in this case, but I do warn the plaintiffs' counsel that their actions will not go on indefinitely as they attempt to flesh out some certifiable class and thereby coerce settlements from the defendants which have no benefit to the public. To be blunt, none of the classes or subclasses mentioned by the plaintiffs in their complaints, amended complaints or memoranda come close to suggesting any class that might be certifiable under Rule 23. Nor at this point can the court conceive of a subclass of either of the classes proposed by the plaintiffs complaint that might be certifiable.

Although the plaintiffs have no certifiable classes, they have identified individual claims, particularly with respect to several plaintiffs who have contracted thyroid cancer, allegedly from exposure to the defendants' emissions. The individual claims are addressed below.

## VIII.

### Individual Claims

All of the defendants maintain that Tennessee's one-year statute of limitations for personal tort actions bars the plaintiffs' claims. Tenn.Code Ann. § 28–3–104(a)(1), (3) (2000). While the plaintiffs do not dispute that the one-year statute of limitations applies, they contend that the statute did not begin to run until January 15, 2000, when ORHASP released its final report.

In light of the one-year statute of limitations, the defendants filed a motion to dismiss, or in the alternative, a motion for summary judgment. [Court File # 33]. Because matters outside the pleadings were presented to and considered by the court, the defendants' motion to dismiss will be treated as a motion for summary judgment. Fed. Rule Civ. Pro. 12(b)(6).

Pursuant to Rule 56, summary judgment shall be rendered when requested if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. It is the burden of the party seeking summary judgment to show the court that, under uncontradicted facts, the moving party is entitled to judgment as a matter of law. Summary judgment is intended to provide a quick, inexpensive means of resolving issues as to which there is no dispute regarding the material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In asserting the validity of a summary judgment motion, the court views the pleadings, depositions, answers to interrogatories, admissions, and competent affidavits in the light most favorable to the opponent of the motion. However, the party opposing the motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence, specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which the party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

When considering a motion for summary judgment, Rule 56(f) allows the court to order discovery if it "should appear from the

affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition." Fed. Rule Civ. Pro. 56(f). The *Heiser* and *Ball* plaintiffs have not satisfied the requirements of Rule 56(f). However, even if they had, they have not described any helpful discovery in light of the fact that it has been publicly debated since the early 1980s that toxins are present in the Oak Ridge community. Furthermore, there is no information contained in the ORHASP final report that was not previously available to the public.

▮▮▮▮ Under the discovery rule in Tennessee, a cause of action accrues when the "plaintiff knows, or in the exercise of reasonable care and diligence should know, that an injury has been sustained." *Wyatt v. A–Best Co.,* 910 S.W.2d 851, 854 (Tenn.1995). Likewise, in the Sixth Circuit, a cause of action accrues "when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered." *Raitz v. Sparks,* 105 F.3d 659, 1997 WL 2651, at *2 (6th Cir.1997).

The defendants have presented multiple state and local newspaper articles dating to the mid–1980s that establish that it has been publicly known since then that Oak Ridge residents may have been at increased risk for certain health problems due to mercury emissions in Oak Ridge. For example, on May 18, 1983, *The Knoxville News–Sentinel* published an article entitled "OR Plant Released Huge Amounts of Mercury, DOE Report Reveals," which discussed a DOE report that estimated 2.4 million pounds of mercury from the Y–12 plaint was released in the Oak Ridge area between 1950 and 1977, prompting health department officials to post signs along East Fork Poplar Creek warning residents of the potential health hazard of eating fish from the creek. In addition, there were newspaper articles published in the mid–1990s, such as an article that ran in *The Oak Ridger* on September 12, 1996, entitled

"ORHASP looks at iodine, PCBs," which publicized emissions of radioactive iodine–131 from ORNL during the period 1944–1956 and the concerns that idodine–131 increases the risk of thyroid cancer. This court may take judicial notice of such publicity at any point of the proceedings, Fed.R.Evid. 201, and the court takes judicial notice that extensive publicity surrounding emissions of mercury from Oak Ridge facilities and a possible connection with thyroid cancer occurred in East Tennessee in the mid–1990s.

Both the *Heiser* and *Ball* plaintiffs seek to take discovery regarding when the plaintiffs knew or should have known of their cause of action. However, I find that discovery to be irrelevant in that matters outside the pleadings submitted, and matters of which the court has taken judicial notice, establish that all of the plaintiffs should have known of their causes of action by the middle 1990's at the latest, even if they deny actual knowledge of these claims.[1]

The plaintiffs in *Ball* suggest that the statute of limitations will not run in that case as long as the "vestiges of discrimination" (i.e. Scarboro exists as a predominantly black neighborhood outside the fences of Y–12) remain. The plaintiffs rely on several school desegregation cases wherein the court recognized there is a continuing obligation to eliminate the "vestiges of discrimination." *See Freeman v. Pitts,* 503 U.S. 467, 485, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992); *Columbus Board of Education v. Penick,* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979). However, the de facto discrimination cases regarding school desegregation cited by the *Ball* plaintiffs are not applicable here. Similar vestiges of discrimination are not present in this case because the Scarboro community has been integrated since the 1950s. To find otherwise would mean the statute of limita-

---

1. The court concedes that conceivably a plaintiff with a *still viable claim* could exist (*i.e.,* a person who was diagnosed with thyroid cancer within a year of filing suit). However, none of the individual plaintiffs suggest that they were first diagnosed with thyroid cancer within a year of the filing of the complaint and plaintiffs make no argument that they need discovery to obtain information regarding the time of initial diagnosis. Accordingly, summary judgment is still appropriate on these individuals claims.

tions would never be tolled unless every black person left Scarboro.

The court finds that the individual defendants are all entitled to summary judgment on basis of the statute of limitations issue raised by the defendants in both *Heiser* and *Ball.* Furthermore, this ruling pretermits other issues including those raised by the United States.

## XI.

### *Conclusion*

The classes proposed for certification, and others which the plaintiffs have suggested, are overly broad, ill-defined and unmanageable in a class setting. Accordingly, the plaintiffs' motions to certify are DENIED. All individual claims are clearly barred by the applicable one-year statute of limitations and the defendants are entitled to summary judgment on those claims. In addition, because I conclude that the plaintiffs have not suggested any conceivable certifiable class, these actions will be dismissed in their entirety.

Order accordingly.

### ***ORDER***

For the reasons set forth in the memorandum opinion this day passed to the Clerk for filing, plaintiffs' motions for class certification [Court File # 68 in 3:01–CV–22; Court File # 50 in 3:01–CV–37] are hereby DENIED. Defendants' motion to dismiss the individual plaintiffs' claims on statute of limitations grounds [Court Files # 33 and # 39 in 3:01–CV–22; Court File # 33 in 3:01–CV–37] are hereby GRANTED, and these actions are DISMISSED. All other pending motions are DENIED AS MOOT.